UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| Internet Payments Patents Ltd.<br><br>Plaintiff,<br><br>v.<br><br>PayPal, Inc.<br><br>Defendant. | Case No. 6:24-cv-00047<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Internet Payments Patents Ltd. ("IPPL" or "Plaintiff") hereby sets forth its Complaint against Defendant PayPal, Inc. ("PayPal" or "Defendant"), and states as follows, based on knowledge as to itself and its own acts and on information and belief as to all other matters except as indicated otherwise:

**INTRODUCTION**

1. As further stated herein, IPPL alleges that PayPal misappropriated its valuable technology following a meeting in which one of its founders and executive officers, Tony Foran, was encouraged to share confidential information with PayPal under the guise of a potential partnership. PayPal subsequently misappropriated and misused this confidential information to build its well-known payment services. Accordingly, IPPL seeks monetary damages and injunctive relief in this action.

1

## THE PARTIES

2. Plaintiff IPPL is an Irish registered limited private company limited by shares with its principal place of business at Elsinore, 66B Meath Road, Bray, Wicklow, A98 XD23, Ireland.

3. On information and belief, PayPal is a corporation organized and existing under the laws of Delaware with twenty-nine office locations throughout the U.S. and abroad, including places of business at 10025 Alterra Pkway Suite 2400, Austin, TX 78758 and 7700 W Parmer Ln., Austin, TX 78729.  PayPal is registered to do business in the State of Texas and has been registered since 2003.  PayPal may be served through its registered agent CT Corporation System, at 1999 Bryan St., Ste. 900, Dallas, TX 75201.

4. On information and belief, PayPal directly and/or indirectly develops, designs, uses, distributes, markets, offers to sell, and/or sells payment products and services in the United States, including in the Western District of Texas, and has otherwise engaged in free riding off of IPPL's technology in competition with IPPL in this District, in connection with its products and services as set forth in this Complaint.  This includes, but is not limited to, PayPal offering its payments platform for processing electronic payments and for transferring funds to and from others.

## JURISDICTION AND VENUE

5. This Court has exclusive subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

6. This Court has personal jurisdiction over PayPal because PayPal is a multinational company that has a significant presence in this District through the products and services PayPal provides residents of this District.  PayPal regularly conducts business and has committed and benefitted from acts of misappropriation of trade secrets within this District that give rise to this

action and have established minimum contacts within this forum such that the exercise of jurisdiction over PayPal would not offend traditional notions of fair play and substantial justice.

7. PayPal has derived substantial revenue from providing goods and services to residents of this District and within the State of Texas in competition with IPPL's products and using its trade secrets.

8. Further, PayPal has hired and are hiring in the Austin, Texas area and elsewhere in this District for positions that relate to the misappropriated trade secrets. As discussed above, PayPal maintains offices in Austin, Texas and, on information and belief, employs more than 1,000 people in the Austin area. In addition, as discussed further herein, multiple witnesses from PayPal's Austin, Texas office will be required for trial.

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391. PayPal is registered to do business in Texas and, upon information and belief, PayPal has transacted business in the Western District of Texas and has regular and established places of business in this Judicial District. Further, all allegations regarding jurisdiction herein are incorporated by reference for the purposes of venue.

10. On information and belief, the more than 1,000 PayPal employees in this District work in at least the following teams: Corporate Strategy, Product Management, Product Development, Software Development, UX & Development, Communications & Public Policy, Software Engineering, Legal, Innovation & Patents, Design & User Experience, and Sales & Marketing. PayPal's employees in those divisions work, at least in part, on PayPal Commerce Platform products or in subject matters related to the PayPal Commerce Platform products that are relevant to the claims or defenses in this action.

11. On information and belief, the below contains a non-exhaustive listing of several PayPal employees located in this District that are key fact witnesses and have knowledge that is relevant to the claims and defenses in this action:

- Curtis Keith, executive for Global Strategic Payments and Payment Integrations;
- Rob Long, architecting integrations at Enterprise Solution Engineering;
- John Kim, Executive Vice President and Chief Product Officer who leads the merchant product and engineering teams;
- Shawn Catoe, Senior Software Engineering Manager who worked on Payments Processing;
- Satish Nekkalapudi, Web Architect for PayPal Wallet;
- Kurt Campisano, Senior Vice President of Global Sales.

12. Further, PayPal has not contested proper venue in previous cases in this District. *See, e.g.*, *PayPal, Inc. v. RetailMeNot, Inc.*, 6:20-cv-00339-ADA, Dkt. 29, August 1, 2020.

## FACTUAL ALLEGATIONS

### I. IPPL AND ITS INNOVATIVE TECHNOLOGY

13. IPPL was founded on February 6, 2001. From the date of its founding and for several years after, IPPL developed and licensed the development of, *inter alia*, payment technologies and systems to build and launch a payments business.

14. In the late 1990s and early 2000s, purchasing goods and services over the Internet was cumbersome, unreliable, and sometimes dangerous. To effectuate such transactions, customers had to commonly provide personally identifying information to the merchant, including things such as credit card numbers, names, and addresses. Doing so came with a host of problems. For example, providing credit card numbers meant that it was easy for such numbers to get stolen, and for thieves to use a stolen number to purchase goods and services. Oftentimes, customers would also prefer to

remain anonymous when making purchases, whether because they did not want anyone to know they were making such a purchase, or they did not want to receive unwelcome solicitations such as junk mail.

15. IPPL's solution to these problems was elegant and innovative. Instead of a direct customer-to-merchant model where the customer sends its information directly to a merchant, IPPL's system allowed a customer to communicate with a customer accounts server, and a merchant to communicate with a merchant accounts server, respectively, in order to initiate a transaction. The customer accounts server and merchant accounts server then communicate with each other, along with a system services server, in order to process and complete the transaction. As a result, anonymity and security are provided to the customer and more efficiently and safely effectuates Internet transactions between customers and merchants.

16. Indeed, the largest players in the payments sector at the time recognized the value of the technology. Upon being presented with technology, these entities stated that it was "revolutionary," "a real disruptive technology solution," and an "elegant solution," among others.

## II. PAYPAL LEADS IPPL INTO DISCLOSING ITS VALUABLE INTELLECTUAL PROPERTY AND CONFIDENTIAL INFORMATION UNDER THE GUISE OF A POTENTIAL PARTNERSHIP

17. In the early 2000s, PayPal's payment system consisted primarily of a person-to-person model, which focused on the eBay auction site.

18. In August and September of 2002, Mr. Foran communicated with PayPal about his company's groundbreaking technology. First, on August 9, 2002, Mr. Foran called Reid Hoffman, the then-Executive Vice President of PayPal Inc. He spoke with Sarah Jane Wallace about discussing IPPL's technology with Mr. Hoffman. Mr. Foran followed up on August 12, 2002 with an email to Ms. Wallace, attaching a memo. Mr. Foran's email was forwarded to Peter Ashley, Director of

5

Business Development.  Mr. Ashley responded to Mr. Foran on August 26, 2002.  A copy of Mr. Ashley's email is reproduced below:

```
From: Peter Ashley [mailto:pashley@paypal.com]
Sent: 26 August 2002 18:11
To: Tony Foran
Cc: Reid Hoffman; Sarah Jane Wallace
Subject: Follow up from PayPal

Tony,

Your email was forwarded to me and I'll be happy to take a closer
look at your partnership proposal.  Please provide me any
additional literature that would detail how a partnership with your
company would add value to PayPal and what exactly we would be
offering your customers, or what you would be offering to our's.
Finally, let me know if you're still interested in meeting on
September 10th, I have a fairly tight schedule that day but may be
able to accomodate.

-Peter


Peter B. Ashley
Director, Business Development
PayPal Inc.
(650) 864-8128
pashley@paypal.com
```

19.     On August 27, 2002, Mr. Foran spoke with Mr. Ashley on the phone to take him up on his invitation for a meeting.  On the call, they scheduled the meeting at September 10, 2002 for 10:00AM PST. Mr. Foran followed up with an email to confirm the meeting time and location.  The same day, Mr. Ashley confirmed the location.

20.     To cultivate the potential "partnership" with Paypal, Mr. Foran met with Mr. Ashley at PayPal's offices and gave a presentation.  The second slide of the presentation, reproduced, made clear that the information being presented was private and confidential to the parties.



21.     Mr. Ashley acknowledged that the information presented would be treated as confidential and allowed the presentation to continue.

22.     The fourth slide of the presentation, reproduced below, indicated that Internet Payments was interested in a partnering / co-branded business opportunity.



23. The sixth slide in Mr. Foran's presentation to PayPal, reproduced below, included a co-branded logo for a proposed "Paypal Fortress" payment service, utilizing the technology presented.



24. The eleventh slide of the presentation, reproduced below, covered the novel transaction flows underpinning the company's technology.

8



25.     The thirty-fourth slide in the deck, reproduced below, identified the partnering business model proposed by IPPL.  Mr. Foran thought it was important to include slides showing the relationship between PayPal and his company given Mr. Ashley's stated interest in a "partnership," on behalf of PayPal.  In the slide, PayPal would become a "Customer Partner" (highlighted yellow), which would entail PayPal recruiting its customers for the co-branded "PayPal Fortress" payment service and sharing in the transaction fees.



26. At the time, PayPal used "P2P" (person to person) payments as shown in the last row of the thirty-eighth slide, reproduced below. The slide also identifies the competitive advantage of IPPL's "Fortress Payments Service" over competitors in the online payments market.



10

27. The next slide, number thirty-eight in the deck, again reproduced below and which was presented to PayPal, described PayPal's involvement in the proposal.



28. Slide forty-one in the presentation to PayPal described next steps for PayPal to engage in the business opportunity proposed, whereby PayPal customers could make online purchases from non-eBay merchants.

11



29.     On information and belief, under the guise of forming a "partnership,", PayPal led Mr. Foran, on behalf of IPPL, to disclose its valuable intellectual property, trade secrets and other confidential information.  However, on further information and belief, PayPal had no intention of partnering.  PayPal were in contact again in 2011 and 2012, and PayPal refused to partner or otherwise work with IPPL.

### III.    EXEMPLARY MISAPPROPRATIONS OF IPPL'S TECHNOLOGY

30.     Recently, PayPal published various articles as part of its "Business Resource Center" website which reveal that it has used and adopted the confidential technology presented to it by IPPL in the 2002 presentation as part of its payment platform, without IPPL's consent.

31.     For example, in an article titled "Online payment processing players," published on July 17, 2023 and available at https://www.paypal.com/us/brc/article/online-payment-processing-

players, PayPal describes that "[a]s [the] payment processor, gateway, and online merchant account, PayPal authorizes transactions and helps protect electronic payments that come through your website." This tracks the IPPL technology shared with PayPal in 2002.

32. PayPal has also developed and released a JavaScript Software Development Kit, or SDK. Documentation for the JavaScript SDK is available on PayPal's developer website at https://developer.paypal.com/sdk/js/, which indicates that it was last updated on April 6, 2022 as of the date of the filing of this complaint. The website describes that the "JavaScript SDK displays PayPal-supported payment methods on your page to give your buyers a personalized and streamlined checkout experience." Merchants wanting to receive the benefit of accepting payments via PayPal need to "[i]ntegrate the SDK in a script tag or as a module" as specified in an article titled "JavaScript SDK script configuration," available at https://developer.paypal.com/sdk/js/configuration/, which indicates that it was last updated on November 20, 2023 as of the date of the filing of this complaint. In other words, merchants "Use the JavaScript SDK to present payment buttons to [their] payers." This precisely tracks IPPL's technology as shared with PayPal in 2002.

33. Additional recently published product manuals, articles, and guides make clear that PayPal misappropriated IPPL's technology. For instance, and by way of example, PayPal published an article on its website entitled "What is online payment processing and how it works" on June 28, 2023. That article is publicly available at https://www.paypal.com/us/brc/article/how-online-payments-processing-works (last visited December 11, 2023).

34. Also, and by way of example, PayPal published articles on its website describing how payment gateways work behind the scenes of these transactions (October 16, 2023 article entitled "What is a payment gateway and how does it work?"). The article is publicly available at https://www.paypal.com/us/brc/article/what-is-a-payment .

35. PayPal's entire business model requires end users, including users in the United States and specifically in this district (and division), to consummate payments to each other on its platform using the users' depository or other financial accounts. These transactions generate fees and other proceeds which constitute the company's revenue.

## CLAIM 1
### (Misappropriation of Trade Secrets – Defend Trade Secrets, § 1836 et seq.)

36. IPPL repeats and realleges all preceding paragraphs, as if fully set forth herein.

37. PayPal's conduct constitutes a willful and malicious misappropriation of trade secrets in the United States. Such trade secrets include the structure, function, and operation of IPPL's payment architecture ("Misappropriated Trade Secrets").

38. The Misappropriated Trade Secrets have independent economic value because they are not generally known to, and not readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use. For example, the Misappropriated Trade Secrets were appropriately marked as confidential in Mr. Foran's presentation after PayPal, through Mr. Ashley, promised that it would not use or distribute them before being presented with the information.

39. IPPL maintained the secret, confidential information of the Misappropriated Trade Secrets and took reasonable measures to keep the information secret, including through agreements that forbid disclosure or use of such information to anyone outside of IPPLor those under a duty of confidentiality to IPPL.

40. In creating, using, marketing, and selling its online payment processing system, Paypal misappropriated the Misappropriated Trade Secrets. PayPal's payment processing system

incorporates the Misappropriated Trade Secrets, which were derived using improper means. PayPal knew that any use of the technology was a breach of its confidentiality agreement.

41. PayPal has been marketing and using the fruit of its misappropriation, its payment processing system, which incorporates or whose development relies on the Misappropriated Trade Secrets. These efforts have taken place within the United States.

42. PayPal's misappropriation of IPPL's Misappropriated Trade Secrets was willful.

43. IPPL has been damaged as a result of PayPal's conduct, and IPPL seeks damages in accordance with proof at trial, but in any event sufficient to: (1) compensate it for actual losses, including lost profits resulting from PayPal's misappropriation, and (2) recover the amounts that PayPal unjustly received as a result of its misappropriation of the Misappropriated Trade Secrets. In lieu of the above, IPPL is entitled to a reasonable royalty for PayPal's misappropriation.

44. In addition, because PayPal's misappropriation was malicious, PayPal is entitled to recover exemplary damages in an amount equal to twice the damages otherwise recoverable, and to recover its attorneys' fees and costs of suit.

45. If PayPal is not enjoined it will continue to misappropriate and use the trade secrets for its own benefit and to IPPL's detriment.

**CLAIM 2**
**(Misappropriation of Trade Secrets – Texas Uniform Trade Secrets Act, § 134A.0002(6) et seq. )**

46. IPPL repeats and realleges all preceding paragraphs, as if fully set forth herein.

47. PayPal's conduct constitutes a willful and malicious misappropriation, within this state, of the Misappropriated Trade Secrets to which IPPL holds exclusive rights in the United States.

48. The Misappropriated Trade Secrets have independent economic value because they are not generally known to, and not readily ascertainable through proper means by, other persons

who can obtain economic value from their disclosure or use. For example, the Misappropriated Trade Secrets were appropriately marked as confidential in Mr. Foran's presentation after PayPal, through Mr. Ashley, promised that it would not use or distribute them before being presented with the information.

49. IPPL maintained the secret, confidential information of the Misappropriated Trade Secrets and has taken reasonable measures to keep the information secret, including through agreements that forbid disclosure or use of such information.

50. In creating, using, marketing, and selling its online payment processing system, PayPal misappropriated the Misappropriated Trade Secrets. PayPal's payment processing system incorporates the Misappropriated Trade Secrets, which were derived using improper means. PayPal knew that any use of the technology was barred by its agreement.

51. PayPal's misappropriation occurred at least in part in the state of Texas. As set forth above, PayPal has operations in Austin, Texas, including relevant personnel responsible for the creation, use, marketing, and/or selling of its online payment processing system.

52. PayPal's misappropriation of the Misappropriated Trade Secrets was willful.

53. IPPL has been damaged because of PayPal's conduct, and IPPL seeks damages in accordance with proof at trial, but in any event sufficient to: (1) compensate it for actual losses, including lost profits resulting from PayPal's misappropriation, and (2) recover the amounts that PayPal unjustly received as a result of its misappropriation of the Misappropriated Trade Secrets. In lieu of the above, IPPL is entitled to a reasonable royalty for PayPal's misappropriation.

54. In addition, because PayPal's misappropriation was malicious, PayPal is entitled to recover exemplary damages in an amount equal to twice the damages otherwise recoverable, and to recover its attorneys' fees and costs of suit.

55. If PayPal is not enjoined it will continue to misappropriate and use the trade secrets for its own benefit and to IPPL's detriment.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendant as follows:

a. An injunction restraining PayPal and its officers, agents, employees, affiliates, and all other persons in concert with them from further misappropriating or using the trade secrets;

b. Entry of judgment declaring that PayPal is liable for willful and malicious misappropriation of the trade secrets;

c. An award of damages according to proof, including without limitation IPPL's lost profits and amounts by which PayPal has been unjustly enriched, together with prejudgment and post-judgment interest;

d. An award of exemplary and punitive damages and attorneys' fees in light of the willful and malicious nature of PayPal's conduct and misappropriation of the trade secrets; and

e. Such other legal and equitable relief which may be requested and to which the Plaintiff is entitled; and

f. Such other and further relief as the Court deems just and proper.

Dated: January 23, 2024                                Respectfully submitted,

/s/ David L. Hecht
David L. Hecht
dhecht@hechtpartners.com
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 851-6821
*Counsel for Plaintiff Internet Payments Patents Ltd.*